# 17 MAG 1988

ORIGINAL

Approved: _Martin Bell_ _____
Martin S. Bell / Tara M. La Morte
Assistant United States Attorneys

Before:     THE HONORABLE Barbara Moses
United States Magistrate Judge
Southern District of New York

U.S. DISTRICT COURT
FILED
MAR 17 2017
S.D. OF N.Y.

DOC #___ ___

- - - - - - - - - - - - - - - - - - x
                                    :
                                    :
                                    :     **SEALED COMPLAINT**
UNITED STATES OF AMERICA            :
                                    :     Violation of
    - v. -                          :     18 U.S.C. §§ 242,
                                    :     1519, and 2
RODINY CALYPSO,                     :
                                    :     COUNTY OF OFFENSE:
              Defendant.            :     BRONX
                                    :
                                    :
- - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        MICHAEL WENIGER, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

## COUNT ONE
(Deprivation of Rights Under Color of Law)

        1.    On or about February 27, 2014, in the Southern District of New York, RODINY CALYPSO, the defendant, under color of a law, statute, ordinance, regulation, and custom, willfully subjected a person in a State, to wit, the State of New York, to the deprivation of a right, privilege, and immunity secured and protected by the Constitution and laws of the United States, to wit, the right to be free from excessive use of force, which deprivation resulted in bodily injury to a person, to wit, while working as a correction officer in the New York City Department of Correction assigned to Rikers Island in the Bronx, New York, CALYPSO willfully punched a Rikers Island inmate ("Inmate-1") multiple times in the face and head and elbowed him multiple

-1-

times in the back of the head while Inmate-1 was restrained in a shower stall, which resulted in injury to Inmate-1.

(Title 18, United States Code, Sections 242 and 2.)

## COUNT TWO
### (Filing False Report)

2.     On or about February 27, 2014, RODINY CALYPSO, the defendant, knowingly altered, destroyed, mutilated, concealed, covered up, falsified, and made a false entry in a record, document, and tangible object with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, to wit, RODINY CALYPSO falsified a "Use of Force" report concerning his altercation with Inmate-1 with the intent to impede the resulting investigation, which investigation falls within the jurisdiction of the United States Attorney's Office for the Southern District of New York.

(Title 18, United States Code, Sections 1519 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3.     I am a Special Agent with the FBI and have been employed by the FBI since 2011.  I have participated in the investigation of this matter.  I am familiar with the information contained in this affidavit based on my own personal participation in the investigation, my review of documents and recordings, and conversations that I have had with other law enforcement agents and other individuals.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents, and the actions and statements of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### Overview

4.     Based on the sources described herein, there is probable cause to believe that on or about February 27, 2014, a pre-trial detainee at Rikers Island ("Inmate-1") was assaulted by Correction Officer RODINY CALYPSO, the defendant, while

-2-

Inmate-1 was handcuffed behind his back ("rear-cuffed") in the
shower area of a housing facility within Rikers Island.  At the
time, Inmate-1 posed no danger to CALYPSO or any other
correction officer or inmate.  Specifically, CALYPSO, having
just rear-cuffed Inmate-1 through a designated port in the door
to the shower area in which Inmate-1 stood, opened the door to
the shower stall and immediately punched Inmate-1 repeatedly in
the face and head at least three times.  CALYPSO then followed
Inmate-1 into the shower stall and continued to assault him as
Inmate-1 was still rear-cuffed and unable to defend himself.  As
a result of the attack, Inmate-1 suffered bodily injuries,
including lacerations to his head and physical pain.

        5.    Additionally, based on sources described herein,
there is probable cause to believe that, following the assault
of Inmate-1, RODINY CALYPSO, the defendant, and other correction
officers known and unknown, sought to cover up the assault so
that it would appear that the use of force against Inmate-1 was
warranted.  In particular, and among other things, CALYPSO
falsely reported on a "Use of Force" form that (a) Inmate-1
"violently broke free" from CALYPSO's "escort hold" – even
though the video shows that CALYPSO initiated the encounter and
that Inmate-1 did not attempt to "violently break free" from
CALYPSO's "escort hold"; (b) Inmate-1 spit on CALYPSO and then
attempted to do so a second time, notwithstanding that the video
of the encounter belies any such attempt, as does CALYPSO's
February 2017 interview, in which he admitted that he had no
reason to believe Inmate-1 had attempted to spit at him a second
time; and (c) CALYPSO had to "forcefully push[]" Inmate-1 before
Inmate-1 "pinned" CALYPSO against the shower wall, leading
CALYPSO to hold onto Inmate-1's "upper torso," when in fact
CALYPSO put Inmate-1 in a headlock and punched him several times
in the head and subsequently repeatedly elbowed Inmate-1 in the
head from behind.

## Background

        6.    Based on my training and experience, and my
review of documents, including records provided by New York City
Department of Correction ("NYCDOC"), the New York City
Department of Investigation ("DOI"), and the Bronx District
Attorney's Office, and visit to, and review of pictures and
video of housing area 5 North in the Otis Bantum Correctional
Center ("OBCC") on Rikers Island, and discussions with NYCDOC
and DOI personnel, I have learned the following about the

locations and individuals involved in the assault of Inmate-1:

### The Scene of the Assault

        a.    Rikers Island is a municipal jail complex, located in the Bronx, New York, and maintained by the NYCDOC.

        b.    The OBCC is a facility on Rikers Island that houses, among other inmates, inmates in need of maximum security.  It is separated into multiple dorm areas, including but not limited to Dorm 5 North ("5 North").  In February 2014, Dorm 5 North was a punitive segregation facility, in which inmates were generally kept in solitary confinement in individual cells that were locked for approximately 23 hours per day.  The shower facilities within 5 North were individual stalls designed to be occupied by one inmate at a time.  The shower stalls were enclosed behind metal doors encased in Plexiglass.  The shower stall doors contained slots or ports at approximately waist level, through which inmates could present their hands to be cuffed or uncuffed (the "cuffing port").  Inmates were brought to the shower stalls in handcuffs that were removed by an officer through the cuffing port after the inmate entered the stall and the door was closed.  After the inmates finished showering, they were similarly handcuffed again through the cuffing port before being brought out of the stall.

        c.    5 North consists of three tiers: a main level, a lower tier and an upper tier.  The lower and upper tiers each were largely visible from the main level and accessible from the main level by a flight of steps.  The main level also provides access to the "bubble," i.e., the control center for the 5 North area, which is lined with windows facing into the dorm area and the hallway outside of the dorm.  At all times relevant to this Complaint, the upper and lower tiers each contained approximately 25 cells for individual inmates, which generally remained locked.  The shower area relevant to this Complaint was at the end of a row of cells on the upper tier.  That shower area was fully visible from a row of cells on the opposite side of the upper tier across an open space.

        d.    The controls that unlock the doors leading from the housing areas in 5 North into an exterior hallway and the rest of the OBCC are located in the bubble, which is staffed at all times by a correction officer.  Accordingly, individuals entering or exiting 5 North would need to be allowed (or "buzzed") in by the correction officer in the bubble.

-4-

e.      There are surveillance cameras throughout the 5 North dormitory area, including in the shower area.

## The Victim

f.      Beginning in or about May 2012, through and including February 27, 2014, Inmate-1 was a pre-trial detainee housed in various facilities at Rikers Island.  Inmate-1 had been housed at OBCC twice during that period of time, once between July 2012 and June 2013, and again from February 7, 2014 up to and including February 27, 2014.

## The Defendant and Other Relevant Persons

g.      RODINY CALYPSO, the defendant, joined NYCDOC in August 2004 as a Correction Officer, and he remains on active duty at Rikers Island.  On the morning of February 27, 2014, CALYPSO was working as the "meal relief" officer in 5 North, which was not his regular post.  Specifically, he relieved an officer who had previously escorted Inmate-1 and other inmates into the showers.

h.      On the morning of February 27, 2014, another correction officer ("CC-1") was working as the "suicide watch" officer within 5 North, individually monitoring two inmates who were believed to pose particular risks of harming themselves.

i.      Inmate-2, Inmate-3, and Inmate-4 are inmates who, on the morning of February 27, 2014, were incarcerated at OBCC and occupied cells opposite the shower area on the upper tier of 5 North.

## The Assault of Inmate-1

7.    I have reviewed videotaped surveillance footage of 5 North from February 27, 2014.  From my review of the videotape, I have learned the following:

a.    The events described in this Complaint were captured on videotape by multiple surveillance cameras.  One of these cameras provided a direct view of the shower stalls ("Camera-1").  Due to Camera-1's position, its view was similar to that of the cells occupied by Inmate-2, Inmate-3, and Inmate-4.  Neither Camera-1 nor the other video surveillance I have reviewed contained audio.

b.    As reflected on the video captured by Camera-1, at approximately 11:46 a.m., RODINY CALYPSO, the defendant, approached the shower stall occupied by Inmate-1, who had been brought there earlier by another correction officer.  After CALYPSO arrived outside the shower stall, he and Inmate-1 engaged in a lengthy verbal exchange during which Inmate-1 repeatedly pointed through the cuffing port at the floor outside of his stall.

c.    After exchanging words with Inmate-1 for approximately one minute, CALYPSO slid what appeared to be an item of clothing that had been on the floor outside the shower door towards himself with his foot, then picked it up and placed it on a chair outside of the stall.  Inmate-1 continued to gesture, this time in the direction of the chair, and CALYPSO picked up the items and handed them to Inmate-1, who received them through the cuffing port.

d.    As captured by Camera-1, CALYPSO remained standing in front of the shower stall door, and it appeared as though he and Inmate-1 continued to speak.  At one point, CALYPSO, holding a pair of handcuffs, turned away from the door and went to the railing of the upper tier, from which one could see the main level below.  As reflected in the video, CALYPSO appeared to call down to someone below and made a pointing gesture.  Other camera angles show that the individual on the level below was CC-1.

-6-

                    e.    At this point, as captured by other cameras,
CC-1 walked over to both sides of the lower tier and looked over
the railing, as if to see who was in each tier.  CC-1 then went
over to the main entrance into 5 North and, once the door
opened, walked out into the area near where officers can enter
the bubble.

                    f.    Meanwhile, as captured by Camera-1, CALYPSO
returned to the door of Inmate-1's shower stall.  At one point,
CALYPSO looked briefly over his shoulder in the direction of the
main level.  He then turned to the door and rear-cuffed Inmate-1
through the cuffing port.

                    g.    CALYPSO opened the stall door just as a
correction officer ("Officer-1") who had previously been outside
of 5 North, jogged through the entrance and up to a position on
the main level from which one can see up to the section of the
upper tier containing the shower stalls.  Officer-1 had been
followed into 5 North by CC-1.

                    h.    Before completely opening the stall door,
CALYPSO looked over his shoulder, in the direction of Officer-1.
CALYPSO then opened the door at approximately 11:51 a.m.

                    i.    Video footage from Camera-1 shows that,
immediately after opening the door to its widest point, and
without warning, CALYPSO punched Inmate-1 in the face from his
position standing in front of him.  The video footage does not
show any aggressive movements by Inmate-1 towards CALYPSO prior
to being punched by him.  Inmate-1's hands were behind his back,
where they had been handcuffed.  Without pause, CALYPSO punched
Inmate-1 a second time, and then a third.  The second and third
punches pushed Inmate-1 further back into the stall, and the
momentum of the punches carried CALYPSO into the stall as well.

                    j.    Once in the stall, CALYPSO pulled Inmate-1
into a headlock.  While holding him in the headlock, CALYPSO
punched him in the head several more times.  He then wrestled
with Inmate-1, grabbing his right side but slipping to the
ground himself until he was seated within the shower, still
clinging to Inmate-1.

k.    At the time of the first punches, Officer-1 walked (at a slower speed than he had jogged into the housing area) up the steps to the upper tier and to the shower area.  He arrived as CALYPSO was clinging to Inmate-1, after he had landed several punches to Inmate-1's face and head.  As Officer-1 restrained Inmate-1, CALYPSO regained his footing and forcefully elbowed Inmate-1 repeatedly -- approximately five times -- in the head area.  At that point, another officer ("Officer-2") arrived at the shower area.  CALYPSO, Officer-1, and Officer-2 grabbed Inmate-1, who remained handcuffed, and put him on the ground outside of the cell.  The assault by CALYPSO on Inmate-1 lasted approximately 30 seconds.

l.    Approximately three minutes after Inmate-1 was placed face down outside the shower stall, a team that typically responds to use of force incidents and other prison emergencies (the "Probe Team") arrived on the scene.  At around that time, CALYPSO left the tier.  The Probe Team members then stood Inmate-1 up and walked him away from the shower area.

8.    I have interviewed Inmate-1 and reviewed prior interviews of Inmate-1, and from those interviews learned the following:

a.    Inmate-1 did not know RODINY CALYPSO, the defendant, prior to February 27, 2014.  While he was in the shower on that date, Inmate-1 asked CALYPSO to retrieve items, including clothing, that had fallen out of the cuffing port onto the floor outside of the shower.  CALYPSO had initially declined to do so and Inmate-1 grew irritated, at several points asking CALYPSO why he was afraid of him.  Finally, CALYPSO retrieved the items and gave them to Inmate-1.

b.    Inmate-1 recalled that CALYPSO, who had not yet opened the door to the shower stall, then went over to the rail to speak to someone else within the facility, saying something that sounded like, "pass the PBA" or "push the PBA."  In Rikers Island, the "PBA" refers to a personal body alarm, which summons assistance from the Probe Team in the event of an emergency.

c.    When CALYPSO opened the door to the shower stall, Inmate-1 did not spit at CALYPSO or otherwise make any aggressive moves to physically provoke CALYPSO.  Inmate-1 did not expect to be punched by CALYPSO, and was unable to defend himself because he was rear-cuffed.

-8-

        d.    Inmate-1 could feel the back of his head bleeding after the attack.  He subsequently learned that he had a cut in the back of his head and under one eye as a result of the attack by CALYPSO and subsequently felt physical pain in his head from the numerous punches he received by CALYPSO.

        9.    I have interviewed Inmate-2, Inmate-3, and Inmate-4.  From these interviews, I have learned the following:

        a.    Inmate-2, Inmate-3, and Inmate-4 were each in their respective cells at the time of the attack.  Each of them saw RODINY CALYPSO, the defendant, open up the shower stall door and punch Inmate-1, seemingly unprovoked.  None of them recalls Inmate-1 spitting on CALYPSO or otherwise acting in a physically aggressive way that would provoke a physical response.

        b.    Inmate-2 heard Inmate-1 and CALYPSO arguing about the items that had fallen in front of the door, and further heard Inmate-1 using foul language with CALYPSO.

        c.    Neither Inmate-2, Inmate-3, nor Inmate-4 recalls seeing any sign of spit when CALYPSO left the tier after the attack, although they do recall seeing other details of CALYPSO's shirt, such as tears in the fabric and blood.

        d.    Inmate-3 recalls CALYPSO calling down to CC-1 prior to the attack, saying something like "push the pin."

        10.    I have reviewed medical records pertaining to Inmate-1 from a report taken at 12:20 p.m. on February 24, 2017, when Inmate-1 received medical attention following the incident.  The records indicate that Inmate-1 had a laceration on his rear scalp, and a second laceration by his eyebrow.  The records further indicate that the scalp wound was closed with a stitch, and the eyebrow wound was treated with Dermabond, a topical skin adhesive.

### The Cover-Up of the Assault on Inmate-1

        11.    I am aware that NYCDOC promulgates written directives (the "Use of Force Directives") concerning when the use of force against inmates by correction officers is appropriate, and trains each New York City Correction Officer on these guidelines.  I have reviewed these directives.  Among

other things, the Use of Force Directives prohibit (1) the use of more force than is necessary to restrain an inmate, control a situation, or protect oneself or others, (2) the use of more force out of proportion to the threat posed by an inmate at the time,  (3) the use of blows where a control hold, grasping, or pushing would suffice to restrain the inmate, (4) the direction of blows to the head if the use of such blows is otherwise avoidable, and (5) multiple strikes, punches, or kicks where a single blow would be sufficient to stop an inmate's attack. According to the Use of Force directives, force is to be used as a last resort, when an inmate in restraints is still dangerous to himself and others.

        12.   I have reviewed a "Use of Force" form filled out by RODINY CALYPSO, the defendant, and dated February 27, 2014. I am aware from speaking to NYCDOC personnel that officers involved in uses of force at Rikers Island, along with officers who witness uses of force, are instructed to fill out such forms by the end of the tour during which the use of force took place. I have also learned from NYCDOC documents that CALYPSO's Use of Force form may not have been completed until the next day, even though it was dated February 27, 2014.  I believe that CALYPSO's Use of Force form contains various statements that are contrary to the events as captured on video surveillance and as recounted in the interviews I have conducted of Inmate-1 and others.  In particular, the Use of Form completed by CALYPSO states the following:

        a.    That when CALYPSO opened the shower stall door, CALYPSO grabbed a hold of Inmate-1 "in an escort hold" and began to take him out of the shower stall when Inmate-1 "abruptly/violently broke free from [CALYPSO's] escort hold" by lowering and twisting his body to face CALYPSO, and then suddenly spit on him and tried to do so a second time.  In contrast, the video surveillance shows that CALYPSO began punching Inmate-1 immediately after opening the shower stall door and grabbing hold of Inmate-1's arm, seemingly without provocation.

        b.    That Inmate-1 managed to bend down and use his shoulder and his head to pin CALYPSO against the wall, forcing CALYPSO to hold onto Inmate-1's upper torso area with his right arm over his head in order to prevent himself from falling on his back.  Instead, the video footage shows that CALYPSO put Inmate-1 in a headlock and punched him several times before CALYPSO slipped back into a sitting position at a later

point in the altercation, and that once CALYPSO regained his footing, he continued to assault Inmate-1 by forcefully elbowing him in the head from behind.

          c.    That force "was necessary to defend ones self," [sic] even though neither the video nor any witnesses offers any reason why the force applied was necessary.

          13.    I have reviewed the NYCDOC investigative file as well as the investigative files of DOI, which contained, among other things, the Use of Force forms filled out by witnesses, photographs and interview notes taken by investigative staff, and medical records.  In reviewing these files, I have seen a photograph of RODINY CALYPSO, the defendant, taken shortly after the assault on Inmate-1.  The photograph features a uniformed CALYPSO with a large gob of spittle on the front of his shirt near the upper right shoulder.  In reviewing the NYCDOC and DOI investigative files, I have also become aware that the shirt worn by CALYPSO during the confrontation with Inmate-1 was not preserved after the photograph was taken, and no DNA or any other testing was performed or could be performed on the purported spit as a result.

          14.    I have reviewed minutes of a state grand jury in the Bronx before which RODINY CALYPSO, the defendant, testified in May 2015.  From my review, I have learned the following:

          a.    CALYPSO made an oral statement before the Bronx grand jury about the events of February 27, 2014.  In his account, which he made after reviewing the video footage captured by Camera-1 and other cameras, CALYPSO stated that Inmate-1 had refused to put on a shirt and had told CALYPSO to pick up his laundry from outside the door, which CALYPSO did after moving it to a safe position from which to pick it up. After handcuffing Inmate-1, who was facing away from him, through the cuffing port, CALYPSO opened the shower stall door, only to have Inmate-1 suddenly turn in his direction.  According to CALYPSO, Inmate-1 then spit on him, and CALYPSO "reacted" with three or four "palm strikes" toward his face.  CALYPSO claimed that things moved too quickly for him to use the pepper spray he was armed with.  CALYPSO further stated that Inmate-1 "dipped down" below CALYPSO's center of balance such that CALYPSO could not see whether Inmate-1's cuffs were still on. CALYPSO stated that he grabbed Inmate-1's head and pulled him up, but wound up slipping in the shower stall while still holding on to Inmate-1's side, where he had a risk of being

stepped on.  At that point, according to CALYPSO, Officer-1
responded and CALYPSO let go of Inmate-1 while still in the
shower pen.  CALYPSO then "dropped" his whole body on Inmate-1's
back, forcing him to bend down.  Officer-2 arrived at that point
and the three officers took Inmate-1 down together.  CALYPSO
also stated in the grand jury that his Use of Force report,
which he began to draft at the end of his shift, contained "just
the necessities" and that he believed he would have an
opportunity to amend it.

        b.    CALYPSO offered no explanation in the grand
jury for why he could not have closed the door behind Inmate-1
or otherwise taken advantage of the space created when his first
punches pushed Inmate-1 into the cell.  Further, despite having
reviewed the video surveillance, CALYPSO's account to the grand
jury omitted the headlock and the punches that accompanied the
headlock.  Further, CALYPSO did not mention any of his repeated
elbowing of Inmate-1's head.

        c.    In addition, in contrast to his "Use of
Force" form account, CALYPSO's grand jury testimony did not
mention putting Inmate-1 in an "escort hold" before the attack
began, and accurately acknowledged that he had made contact with
Inmate-1's head and face area.

        15.    I interviewed RODINY CALYPSO, the defendant, on
or about February 28, 2017.  In response to questions about the
incident, CALYPSO stated that he did not, in fact, have any
reason to believe that Inmate-1 attempted to spit at him a
second time other than his allegedly having done so once,
contrary to what CALYPSO had written in his Use of Force form.

        16.    Based on this investigation, including the facts
set forth above, I believe that RODINY CALYPSO, the defendant,
used excessive force against Inmate-1, in violation of his
rights under the United States Constitution, even if CALYPSO's
allegation that Inmate-1 spit at him was true.  Further, and
based on the investigation, including the facts set forth above,
I believe that CALYPSO made up the allegation that Inmate-1 spit
on him in order to justify the assault.  Among other reasons,
(1) the actions of CC-1 and Officer-1 after CALYPSO called down
to the main level and before CALYPSO opened the stall door
indicate that CALYPSO made them aware that something was about
to happen, and that premeditation is not compatible with
CALYPSO's account of Inmate-1 suddenly spitting at him; (2)
CALYPSO's sustained bodily contact with Inmate-1 during the

-12-

assault in the shower stall does not appear compatible with the preservation of the gob of spit ultimately photographed on CALYPSO's uniform shirt; (3) CALYPSO falsely reported on his Use of Force form that Inmate-2 had attempted to spit on him a second time; (4) CALYPSO's shirt disappeared after the photograph was taken, despite the spit itself being important evidence of what had taken place; (5) the location of the spit compared to the position of Inmate-1's face when the door opened makes such an account appear unlikely; and (6) during his February 2017 interview, CALYPSO stated that he was concerned about the potential exposure to pathogens from being spat upon by Inmate-1, yet admitted that he did not inform the NYCDOC doctor who examined him after the incident that he had been exposed to spittle.

        WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of RODINY CALYPSO, the defendant, and that he may be imprisoned, or bailed, as the case may be.

                                    _____
                                    Special Agent Michael Weniger
                                    Federal Bureau of Investigation

Sworn to before me this
____day of March, 2017

_____
THE HONORABLE
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK